**Beau Ryan HANSEN, Petitioner,**

v.

**UNITED STATES of America, Respondent.**

**No. 00–CV–104–J.**

United States District Court, D. Wyoming.

Sept. 25, 2001.

Beau Ryan Hansen, Pekin, IL, Pro se.

## ORDER DENYING MOTION UNDER 28 U.S.C. § 2255

ALAN B. JOHNSON, District Judge.

The above-entitled matter came before this Court upon Mr. Hansen's motion under 28 U.S.C. § 2255 to vacate, set aside, or correct a sentence by a person in federal custody. The Court has reviewed the motion and all the material on file, and being fully advised, finds that the motion should be denied.

## I. BACKGROUND

Mr. Hansen pleaded guilty to conspiring to possess with intent to distribute, and to distribute, methamphetamine in violation of 21 U.S.C. §§ 846 and 841. This Court sentenced Mr. Hansen to 121 months imprisonment on September 10, 1999. Mr. Hansen did not appeal his sentence. However, on May 24, 2000, he filed the present motion to vacate, set aside or correct his sentence, and on September 18, 2000, Mr. Hansen requested to amend his 2255 motion.

In his original motion, Mr. Hansen claims that his right to due process was violated because his sentence was based on a quantity of methamphetamine which was more than double the amount of methamphetamine on which his supplier's sentence was based. Mr. Hansen suggests that he should be re-sentenced because of the dis-

parity between his sentence and his co-defendant.

In his request to amend his 2255 motion, Mr. Hansen also claims that his plea should be vacated under *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), because he was not informed that the type and quantity of controlled substance were essential elements of the offense, rather than sentencing factors to be determined by the Court.

## II. DISCUSSION

### A. INCONSISTENT DRUG QUANTITIES

Mr. Hansen complains that his 121-month sentence was based on 567 grams of methamphetamine, while his supplier, Robert Fake, was only sentenced to 78 months imprisonment based on 227 grams of methamphetamine. He submits that his due process was violated because the prosecutor relied on inconsistent and irreconcilable theories of culpability. Mr. Hansen's contention lacks merit for two reasons.

■ First, a claim of a more severe sentence than that received by a co-defendant is generally not cognizable under section 2255. *United States v. Hutchinson*, 21 F.3d 1122, 1994 WL 123325, at *2 (10th Cir.1994). As explained in *Diaz–Cruz v. United States*, 77 F.3d 460, 1996 WL 84112, at *1 (1st Cir.1996):

"Absent extraordinary circumstances, a defendant has no … fundamental interest in whether a sentence reflects his … relative culpability with respect to his … co-defendants." *United States v. Bokun*, 73 F.3d 8 (2d Cir.1995). *See also United States v. Rodriguez*, 63 F.3d 1159, 1168 (1st Cir.) ("the mere fact of [a] disparity is of no consequence"), *cert. denied*, 516 U.S. 1032, 116 S.Ct. 681, 133 L.Ed.2d 529 (1995). Appellant fails to state any extraordinary circumstances surrounding his case; he relies instead on a fairness argument. In this context, we note that the general rule in this circuit is that it is not proper for a district court to depart from a guideline range in an effort to equalize the sentences of similarly situated defendants. *United States v. Wogan*, 938 F.2d 1446, 1448 (1st Cir.), *cert. denied*, 502 U.S. 969, 112 S.Ct. 441, 116 L.Ed.2d 460 (1991). Given appellant's lack in this case of a "fundamental interest" in a sentence equal to those of his co-defendants, his claim of disparate treatment is not cognizable on a § 2255 motion. *See, e.g., Entrekin v. United States*, 508 F.2d 1328, 1330 (8th Cir.1974) (defendant's assertion that his sentence was harsher than that received by his co-defendant cannot be raised in a § 2255 motion), *cert. denied*, 421 U.S. 977, 95 S.Ct. 1977, 44 L.Ed.2d 468 (1975).

■ Second, even if a disparate treatment claim were properly brought in a 2255 motion, Mr. Hansen is precluded from raising the issue in a 2255 motion because he failed to raise the issue of appeal. Section 2255 motions are not available to test the legality of matters which should have been raised on direct appeal. *United States v. Cook*, 997 F.2d 1312, 1320 (10th Cir.1993). Failure to present an issue on appeal bars the defendant from raising the issue in a 2255 motion, unless he can show cause excusing his procedural default and actual prejudice resulting from the errors of which he complains, or can show that a fundamental miscarriage of justice will occur if the claim is not addressed. *Id.*

■ Mr. Hansen can show cause for failing to raise his disparate treatment claim on appeal because Mr. Fake was sentenced after Mr. Hansen. *Hutchinson*, 1994 WL 123325, at *2. However, he has not shown prejudice or a fundamental miscarriage of justice for failing to raise the

issue. The Tenth Circuit has expanded its position on downward departure for disparate sentences:

> In *Garza* we stated "disparate sentences are allowed where the disparity is explicable by the facts on the record." 1 F.3d at 1101 (citation omitted). We now expand on that statement, holding that where the record is insufficient to show co-defendants or co-conspirators were similarly situated offenders engaged in similar conduct, a disparity between their sentences is not grounds for a downward departure from the minimum guideline range. A contrary presumption would be contrary to the congressional objective underlying the guidelines of obtaining nationwide uniformity in sentencing. *See Wogan,* 938 F.2d at 1448–49.

*United States v. Blackwell,* 127 F.3d 947, 953 (10th Cir.1997). Mr. Hansen fails to show that he and Mr. Fake were similarly situated offenders, and the presentence reports reflect differences in their conduct and their participation in the conspiracy. Mr. Hansen's presentence report, which Mr. Hansen did not object to, quotes the government's sentencing memorandum describing offense conduct:

> On February 4, 1999, law enforcement officers executed a search warrant at 1740 Hyview, Apartment 4, Casper, Wyoming. Scott Allen Zimmerman ("Zimmerman") and Beau Ryan Hansen ("Hansen") lived at this location.
>
> Zimmerman, when interviewed, stated that over the past several months, Zimmerman had been being supplied with methamphetamine by Norman Fredericks and Robert Dean Fake. Zimmerman estimated that he had received approximately two pounds of methamphetamine via Fake and Fredericks.[1]

FN1 In a subsequent off the record proffer, Zimmerman stated that he believed he had received twenty ounces of methamphetamine from Fake and Fredericks. Based on the totality of the investigation, we believe the twenty ounce figure to be accurate. Zimmerman stipulated to this twenty ounce quantity in his plea agreement. The court used the twenty ounce quantity to sentence Zimmerman on July 26, 1999.

> Zimmerman has further stated that when he received methamphetamine from Fake and/or Frederick, Zimmerman would thereafter deliver the methamphetamine to Hansen to sell to customers in the Casper area. Zimmerman was responsible for obtaining the methamphetamine and paying Fake for fronted methamphetamine and Hansen was in charge of selling the methamphetamine.
>
> Based on this relationship, Hansen's relevant conduct should be set at twenty ounces as well. Twenty ounces converts to 567 grams of methamphetamine.

(Hansen Presentence Investigation Report at 4–5, quoting Hansen Sentencing Memorandum, August 11, 1999.) The presentence report further described and explained Mr. Hansen's relevant conduct:

> **Adjustment for Acceptance of Responsibility**
>
> 11. . . . Hansen acknowledged in open Court he used and sold methamphetamine on the dates and in the general manner alleged in the indictment. He advised this Officer he initially became involved with methamphetamine in January, 1999, while living with codefendant Scott Zimmerman. He stated that within two weeks of his initial use, he began daily use of the drug, and mentioned *knowingly making at least three trips with Zimmerman to obtain methamphetamine.* The defendant also advised he began selling methamphetamine, most of which was given to him by Zimmerman, in order to repay his debt to Zimmerman. . . . (emphasis added)

*Offense Level Computations*

14. The United States' evidence will prove that this conspiracy resulted in the distribution of 1¼ pounds of methamphetamine. Using the drug equivalency and measurement conversion tables in U.S.S.G. § 2D1.1(c), 1¼ pounds is equal to 567 grams, and establishes a base offense level of 32, pursuant to § 2D1.1(a)(3)(c)(4). The defendant, while acknowledging his involvement in this offense as alleged by the Government, maintains the actual amount of methamphetamine for which he is directly responsible is far less, approximately 15 ounces. Under the drug equivalency and measurement conversion tables in U.S.S.G. § 2D1.1(c), 15 ounces is equal to 425 grams, and establishes a base offense level of 30, pursuant to § 2D1.1(a)(3)(c)(5).

15. As provided in U.S.S.G. § 1B1.3, (provisions for relevant conduct), a defendant is responsible for all quantities of contraband with which he was directly involved and, in the case of jointly undertaken criminal activity, *all reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that he jointly undertook.* As the defendant acknowledged accompanying Zimmerman on at least three occasions to obtain methamphetamine, it is the opinion of the Probation Officer that Zimmerman's further distribution of the drug was reasonably foreseeable to the defendant. Therefore, in the Probation Officer's determination, the correct amount of methamphetamine for relevant conduct purposes is 567 grams, the figure alleged by the Government. This amount results in a base offense level of 32.

Mr. Fake's presentence report quoted from two Prosecutor's Statements. The United States Attorney's Office filed a statement for Mr. Frederick and Mr. Fake on June 3, 1999 and filed a statement for Mr. Fake alone on September 16, 1999. The September 16, 1999 statement described the Government's evidence as follows:

1. On February 4, 1999, Scott Zimmerman was interviewed by law enforcement agents. Zimmerman stated that he had been distributing methamphetamine in the Casper area and that he was obtaining the methamphetamine he was selling from Norman Frederick and Robert Fake. According to Zimmerman, Frederick was the ultimate source of methamphetamine and Robert Fake acted as a middleman between he and Frederick. On several occasions Fake distributed methamphetamine to Zimmerman on a "front" basis and Fake subsequently collected money owed on the fronted methamphetamine. Additionally, Frederick distributed directly to Zimmerman on a front basis and Fake collected the money. Zimmerman owed Frederick. In a subsequent interview, Zimmerman indicated that he believed that he had received approximately one and one-quarter pounds of methamphetamine from Fake and Frederick between mid-December, 1998, and February 1, 1999.

2. On February 4, 1999, law enforcement agents set up surveillance on Robert Fake's residence, located at 747 Glenarm, Casper. While watching Fake's residence, law enforcement officers observed Frederick approach the house. Officers pursued Frederick and subsequently recovered one half pound of methamphetamine that Frederick attempted to discard.

3. On February 5, 1999, Robert Fake was interviewed by law enforcement agents. According to Fake, he directly distributed to Zimmerman 8 ounces of methamphetamine on behalf of Frederick.

4. The Government and Fake have agreed that his relevant conduct, including the methamphetamine he distributed and the additional money that he collected from Zimmerman on behalf of Frederick, amounts to between 500 and 1500 grams of methamphetamine.

The June 3, 1999 Prosecutor's statement painted a somewhat different picture of the February 4, 1999 seizure of methamphetamine and evidence obtained from Mr. Zimmerman's interview:

On February 4, 1999, Scott Zimmerman ("Zimmerman") was interviewed by law enforcement agents. Zimmerman informed agents that he had been distributing methamphetamine. Zimmerman informed the agents that he had purchased the methamphetamine from Norman Frederick ("Frederick") and Robert Dean Fake ("Fake").

During the interview, Zimmerman informed agents that in the middle of January, 1999, he received one-quarter pound of methamphetamine from Frederick. Zimmerman also stated that between the middle of January, 1999, and February 1, 1999, he received two additional pounds of methamphetamine from Frederick.[1]

FN1 Zimmerman later indicated he thought he had received a total of one and one-quarter pounds of methamphetamine from Frederick. The government believes this is accurate.

On February 4, 1999, surveillance was established on 747 Glenarm, Casper, Wyoming,[2] in an attempt to locate Frederick. During surveillance law enforcement agents observed Frederick traveling in a van toward I–25. A pursuit of the van ensued by law enforcement agents. During the pursuit, the van traveled across the median and began traveling north on I–25. The van came to a stop and the driver was identified as Frederick. During a search of the north bound shoulder of I–25 and the median where Frederick cut across a Thermos containing one-half pound of methamphetamine was found.

FN2 747 Glenarm was the residence of Robert Fake.

\*　　\*　　\*　　\*　　\*　　\*

On February 5, 1999, an interview was conducted with Robert Fake ("Fake") by law enforcement agents. Fake informed agents that in approximately the middle of December, 1998, he saw Frederick in possession of two pounds of methamphetamine. Fake also admitted he had delivered two, four ounce quantities of methamphetamine to Zimmerman.

At the Change of Plea proceeding on June 4, 1999, Mr. Fake also stated that:

... And I know what my part of the conspiracy was, and I'm willing to admit to my part of the conspiracy. All three, three out of four witnesses involved in this conspiracy have stipulated what my involvement—what my relevant conduct was and that relevant conduct comes out to be less than 250 grams by Mr. Zimmerman's statement, by Mr. Frederick's statement in court here today.

And I have tried to tell Mr. Crank that I'm willing to accept that, and he has told my attorney that I've got you in a box and you have to find your way out of it, and I have no way of finding my way out of it. And I can't see myself pleading guilty to what I didn't do even if it means 20 years. In know that doesn't make sense.

(Transcript of Change of Plea Proceedings, June 4, 1999, at 7.)

Mr. Hansen and Mr. Fake were not similarly situated. They did not have the same roles in the conspiracy. Mr. Hansen's relevant conduct included the methamphetamine that Mr. Zimmerman distributed. The Probation Officer recommended that Mr. Hansen's relevant conduct should include the methamphetamine Mr. Zimmerman had received be-

cause Mr. Hansen admitted that he made at least three trips with Mr. Zimmerman to obtain methamphetamine and it was reasonably foreseeable that Mr. Zimmerman would further distribute the drugs. Accordingly, based on his own admissions, Mr. Hansen's relevant conduct included the entire twenty ounces of methamphetamine received by Mr. Zimmerman. Mr. Hansen himself agreed that he was directly responsible for 15 ounces of methamphetamine.

The June 3, 1999 Prosecutor's Statement, however, indicated that Mr. Zimmerman originally said that he obtained 2¼ pounds from Frederick, and then said that the amount was 20 ounces. Although the September 16, 1999 Statement alleges that Mr. Fake had acted as a middleman for Mr. Frederick, it is unclear the extent to which Mr. Frederick's conduct was jointly undertaken by Mr. Fake. Mr. Fake did admit, however, that he directly distributed 8 ounces of methamphetamine to Mr. Zimmerman. After having the opportunity to assess Mr. Fake's credibility and review the evidence, the Probation Officer found that, "No consistent evidence has been presented to date by the United States to establish by a preponderance a drug quantity of greater than eight ounces of methamphetamine." (Fake Presentence Investigation Report at 3.) This Court agreed and adopted the Probation Officer's findings:

> The Court will adopt the findings of Mr. Olive who prepared the presentence report in this matter with regard to drug quantity. He appears to have examined carefully the available evidence of quantity. There was evidence that—or information through Mr. Frederick, largely, and, I think, through admissions of the defendant as well, some money transferred for Mr. Frederick, but the amount of drugs appears to have been the 8 ounces and that would be the amount that this Court will use in its calculation.

(Sentencing Transcript, Oct. 25, 1999, pp. 11–12.)

Mr. Hansen and Mr. Fake's conduct and participation in the conspiracy therefore were not the same, and the evidence against them was not the same. Accordingly, Mr. Hansen was not prejudiced, nor suffered a fundamental miscarriage of justice, by his failure to raise the disparity issue on appeal. He is consequently barred from raising the issue in his 2255 motion.

**B. APPLICATION OF *APPRENDI V. NEW JERSEY***

Mr. Hansen, in an amendment to his 2255 motion, also contends that his plea should be vacated because he was not informed that the type and quantity of controlled substance were essential elements of the charge, as required by *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

Prior to the United States Supreme Court's decision in *Apprendi*, the type and quantity of drugs involved in a crime was a "sentencing factor" which could be determined by a judge by a preponderance of the evidence. On June 26, 2000, however, the Supreme Court held that other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. *Id.*, 530 U.S. at 490, 120 S.Ct. 2348. The Tenth Circuit Court of Appeals has stated that *Apprendi* applies to 21 U.S.C. § 841(b). *United States v. Keeling*, 235 F.3d 533, 538 (10th Cir. 2000), *cert. denied*, ─── U.S. ───, 121 S.Ct. 2575, 150 L.Ed.2d 738 (2001).[1]

1. The Ninth Circuit has held that section 841(b)(1)(A) and (B) are facially unconstitu-

■ Mr. Hansen, however, did not appeal the *Apprendi* issue, and he is also barred from raising the issue in his 2255 motion unless he can show cause and resulting prejudice or a fundamental miscarriage of justice. As stated in *United States v. Moss,* 252 F.3d 993, 1001–1002 (8th Cir.2001) (footnotes omitted):

> Even assuming an *Apprendi* challenge is not *Teague* barred, we nonetheless conclude that Moss cannot challenge his sentence on *Apprendi* grounds because he failed to raise the argument in his direct appeal. Because habeas relief is an extraordinary remedy which "will not be allowed to do service for an appeal," significant barriers exist in the path of a petitioner who seeks to raise an argument collaterally which he failed to raise on direct review. *See Bousley v. United States,* 523 U.S. 614, 621, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998) (internal citations omitted). More specifically, a claim unraised on direct appeal is procedurally defaulted unless a petitioner can demonstrate (1) cause for the default and actual prejudice or (2) actual innocence. *Id.* at 622, 523 U.S. 614, 118 S.Ct. 1604, 140 L.Ed.2d 828.

Moss contends that cause exists to excuse his default because an *Apprendi* claim falls within the category of those "novel" claims which justifiably may be raised for the first time in a collateral proceeding. The Supreme Court recognized in *Bousley* that "a claim that 'is so novel that its legal basis is not reasonably available to counsel' may constitute cause for a procedural default." *Id.* at 622, 523 U.S. 614, 118 S.Ct. 1604, 140 L.Ed.2d 828 (emphasis added) (quoting *Reed v. Ross,* 468 U.S. 1, 16, 104 S.Ct. 2901, 82 L.Ed.2d 1 (1984)). We recognize the *Apprendi* decision caused an about-face in our understanding of what constitutes an element of an offense, but the argument that drug quantity is an offense element under § 841(b), not a sentencing factor, was certainly available to Moss's counsel at the time of Moss's direct appeal. Our conclusion is consistent with other circuits which have spoken on the issue. *See Sanders,* 247 F.3d at 145–46; *United States v. Smith,* 241 F.3d 546, 548 (7th Cir.2001); *Garrott v. United States,* 238 F.3d 903, 905–06 (7th Cir.2001).

Mr. Hansen has neither shown cause and prejudice nor a fundamental miscarriage of justice to excuse his procedural default.[2]

■ Even if Mr. Hansen had raised the *Apprendi* argument on appeal, he would not be entitled to relief under section 2255 because *Apprendi* is inapplicable to cases on collateral review. *Apprendi* enunciated a new rule of criminal procedure that dictates what fact-finding procedure must be employed to have a fair trial. *Collins v. United States,* 2001 WL 699058,

tional in light of *Apprendi. United States v. Buckland,* 259 F.3d 1157, 1159 (9th Cir. 2001); *United States v. Hitchcock,* 2001 WL 951273, at * 8 (9th Cir. Aug. 23, 2001). The Tenth Circuit, however, rejected a facial challenge to section 841 in *United States v. Cernobyl,* 255 F.3d at 1215, 1218–19 (10th Cir. 2001).

2. Although Mr. Hansen filed a Motion to Expand Record in an apparent attempt to add an ineffective assistance of counsel claim, the motion was filed after the period of limitation had run and must be denied. Mr. Hansen's sentence became final upon the expiration of time for seeking appellate review on September 20, 1999. He had one year thereafter to seek relief under 2255. He filed his motion to expand the record on June 1, 2001, long after the time for filing a 2255 motion. His motion attempts to add a claim that his counsel was ineffective. Treating the request as a motion to amend, the Court finds that it should be denied as it seeks to add a new claim after the period of limitation had run. *United States v. Espinoza–Saenz,* 235 F.3d 501, 505 (10th Cir. 2000).

at *2, 5 (D.Kan. June 11, 2001); *United States v. Sanders*, 247 F.3d 139, 147 (4th Cir.2001). However, as this Court observed in *Klein v. United States*, 125 F.Supp.2d 460, 467 (D.Wyo.2000), with two limited exceptions, new rules of criminal procedure are not applied to cases on collateral review, and *Apprendi* does not fall under any of the exceptions to the general rule. *Id. Apprendi*, therefore, should not be retroactively applied to Mr. Hansen.

■ Finally, as in *Klein*, Mr. Hansen was only sentenced to 121 months, far less than the 20–year statutory maximum.[3] *Apprendi* therefore would not apply to him even if it did apply retroactively to cases on collateral review.

NOW, THEREFORE, IT IS HEREBY ORDERED that Mr. Hansen's motion under 28 U.S.C. § 2255 is DENIED. Mr. Hansen's Motion to Expand Record, Motion for Production of Record, and all other motions pending before the Court, are also DENIED.

---

**3.** This Court also noted in *Klein that* the circuit courts that have dealt with the issue of *Apprendi's* application to 21 U.S.C. § 841 cases have held that when the amount has not been charged in the indictment, submitted to the jury and proved beyond a reasonable doubt, then twenty years under section 841(b)(1)(C) is the maximum sentence that may be imposed upon a defendant.